[Civ. No. 26964. Second Dist., Div. Two. Aug. 9, 1963.]

FRED R. WALLICH, Plaintiff and Appellant, v. JULES SALKIN, Defendant and Respondent.

Hansen & Dolle, John K. Blanche, Victor R. Hansen and William A. Tookey for Plaintiff and Appellant.

Marvin Gross for Defendant and Respondent.

HERNDON, J.—Appellant brought this action seeking cancellation of a $25,000 note and trust deed given by him as consideration for services to be performed by respondent, an architect, in connection with the construction of a building upon appellant's property. His basic contention in the court below was that the agreement entered into between respondent and himself was unenforceable and void because respondent was not a licensed contractor. From the judgment entered in favor of defendant, appellant appeals.

The judgment also determined that under the terms of the agreement appellant was entitled to credit for $8,841 received by respondent in the form of rebates and gratuities from subcontractors. Respondent was awarded an additional $2,000 for certain architectural services which were neither contemplated nor covered by the agreement and which were rendered at appellant's request. Neither of these two items credited to the respective parties is challenged on this ap-

peal. In the trial court appellant made the alternative contention that, if the agreement between the parties should be held valid and enforceable, then respondent's improper conduct during performance had resulted in a breach thereof. However, the trial court's rejection of this alternative contention has not been assigned as an erroneous determination.[1]

Appellant states his conception of the determinative issue as follows: "The principal question presented in this case is whether [respondent] Salkin, a licensed architect, was acting as such; as an employee with wages as his sole compensation; or whether he was acting as a building contractor, and was required to be licensed in order to collect his compensation." On May 2, 1960, when the parties entered into their agreement, section 7026 of the Business and Professions Code provided:

"The term contractor for the purposes of this chapter is synonymous with the term 'builder' and, within the meaning of this chapter, a contractor is any person who undertakes to or offers to undertake to or purports to have the capacity to undertake to or submit a bid to, or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvemnt, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith. The term contractor includes subcontractor and specialty contractor."

And section 7028 of said Code provided: "It is unlawful for any person to engage in the business or act in the capacity of a contractor within this State without having a license therefor, unless such person is particularly exempted from the provisions of this chapter."

Among the exemptions referred to in section 7028 were those provided in section 7050: "This chapter does not apply to an owner who contracts for a project with a licensed contractor or contractors"; and in section 7051: "This chapter does not apply to a licensed architect or a registered civil or professional engineer acting solely in his professional capacity or to a licensed structural pest control operator acting within the scope of his license."

---

[1]In his brief appellant states: "The evidence concerning early completion, breach of agreement, delays, etc., is quite voluminous and conflicting, and appellant will not burden the Court by any attempted résumé thereof."

Neither in his pleadings nor in his briefs filed herein has appellant denied that his ownership of the property involved made him subject to the exemptions set forth in section 7050; hence, we are justified in assuming that the application of its provisions is conceded.

The agreement of the parties recites in part as follows: "Owner [appellant] is desirous of constructing an apartment building and appurtanances [sic] to be located on [specified lots] . . . Architect [respondent] has heretofore prepared plans and specifications for said proposed apartment building. Said plans and specifications were prepared by Architect pursuant to that certain letter agreement dated February 25, 1960, which agreement is not superceded [sic] by this Agreement, and remains in full force and effect.

"Said plans and specifications were submitted to several contractors who bid upon said job. The bids in each instance were in excess of the amount of funds available to Owner to construct said building and therefore, none of said bids were accepted, and Owner plans to construct said building with the aid of the Architect."

The agreement further provided as follows: "Architect will act as Architect and agent for Owner during the construction of said proposed apartment building.

"Architect agrees to obtain estimates and proposals from subcontractors, bids from materialmen and laborers, prepare estimates of costs, secure laborers, materials and subcontractors, supervise the work on a day to day basis, keep accurate books and records, secure the furnishings and appliances, hire and train a manager for the operation of the building, let contracts with Owners [sic] written approval and do all else that is necessary and required in order to expeditiously complete the construction of said apartment building.

"It is understood that all of the duties and functions of Architect shall be performed subject to the approval of Owner. In performing said services Architect agrees to spend at least 50% of his time on said job and to contact Owner in person or by telephone calls to Owner at least twice each working day, up until the date the building is completed.
. . .

"Prior to commencing any construction Architect will prepare a complete cost analusis [sic] and estimate of the entire job, such estimate to be supported by bona fide bids from subcontractors. At Owners [sic] election Owner may request that additional copies of said bids be deposited with Owner

and/or his attorney. Architect will not let any contracts without Owners [sic] prior approval, nor will he commit Owner to any expenditures without Owner's written approval. All correspondence will be in triplicate, one copy to Owner's attorney Victor R. Hansen, and one copy to Architect, and one copy to Owner.

"All claims of expenditures for which work is performed and labor that is furnished in said construction of said building shall be personally approved by Owner and all said checks shall be signed by Owner. It is mutually understood that any apartment house manager that is secured by Architect shall be with the approval of Owner.

"Owner will pay the actual cost of construction, the cost of all labor, materials, subcontracts, implements and appliances, permits, fees, licenses, and any and all other costs attributable to the cost of construction, including but not limited to insurance, workmans [sic] compensation liability insurance. Specifically excluded are any costs for Architect's personal services, except for Architect's fee as set forth below, salaries of any and all employees of Architect, unless they are actually physically working on the job premises with approval of the Owner, or any of the Architect's office overhead or expenses."

The consideration to be paid to respondent as "architect" for the services required of him by the quoted provisions of the agreement was represented by the $25,000 note and trust deed, the cancellation of which is appellant's objective herein. Said agreement also contained provisions for the crediting of any rebates or gratuities that might be received during construction and for bonuses or penalties, dependent upon early or late completion of the building.

▆▆▆ The entire structure of appellant's arguments on this appeal rests upon a foundational assumption that an architect is "acting solely in his professional capacity" only when he is engaged in designing buildings and drawing the plans therefor; and that whenever he steps beyond the strict limits of this role and undertakes to supervise the construction of a building as an owner's agent, he no longer is acting in his professional capacity as an architect, and must, if he is to be compensated for all such services, possess a contractor's license also.

Neither reason nor the applicable authorities support this assumption. Although there is no statutory definition of an

architect's "professional capacity,"[2] a professional or civil engineer, who is similarly exempted by section 7051 is defined by section 6701 as:

"[A] person engaged in professional practice of rendering service or creative work requiring education, training and experience in engineering sciences and the application of special knowledge of the mathematical, physical and engineering sciences in such professional or creative work as consultation, investigation, evaluation, planning or design of public or private utilities, structures, machines, processes, circuits, buildings, equipment or projects, *and supervision of construction for the purpose of securing compliance with specifications and design for any such work.*" (Italics added.)

"Any person practices civil engineering when he professes to be a civil engineer or is in responsible charge of civil engineering work." (§ 6734.) "The phrase 'responsible charge of work' means the independent control and direction, by use of initiative, skill, and independent judgment, of the investigation or design of professional engineering work *or the supervision of such projects.*" (§ 6703.) (Italics added.)

It would seem to present an extremely anomalous situation if *engineers* were held to be exempt from obtaining contractor's licenses when performing supervisory services, while *architects* performing the same services were not. This is particularly apparent when it is noted that section 6737 provides that "[a]n architect, who holds a certificate to practice architecture in this State . . . insofar as he practices architecture in its various branches, is exempt from registration under the provisions of this chapter [relating to engineers]." (See also *Lehmann* v. *Dalis,* 119 Cal.App.2d 152, 154-155 [259 P.2d 727].)

Historically, the practice of architecture encompassed all phases of construction, including the drafting of plans, engineering and construction. (Cf. *Edward Barron Estate Co.* v. *Woodruff Co.,* 163 Cal. 561 [126 P. 351, 42 L.R.A. N.S. 125]; *Boswell* v. *Laird,* 8 Cal. 469.) When statutory regulations of the practice of architecture were first promulgated in 1901 (Stats. 1901, ch. 212), they were designed to

---

[2]However, section 5585 relating to licensed architects does provide: "The fact that the holder of a certificate has been guilty of incompetency or recklessness *in the construction of,* or structural design of a building, constitutes a ground for disciplinary action." (Italics added.) By distinction, therefore, it would appear that an architect may act competently "in the construction . . . of a building."

protect the public from unqualified practitioners of the professions (*Ex parte McManus*, 151 Cal. 331, 333 [90 P. 702]) but did not purport to limit the scope of the activities included therein. Nothing appearing in the statutes thereafter enacted in 1929 (Stats. 1929, ch. 791) regulating building contractors appears to have been intended to restrict by indirection the activities authorized by the issuance of a certificate to practice architecture.

In addition to the considerations of reasonable statutory construction above discussed, it should be noted that all judicial definitions of ''architecture'' and the practice thereof are contrary to appellant's position. ''As used in the statutes regulating the practice of architecture, hereinafter referred to as the Act, an architect is one who holds a certificate to practice architecture in this state. Generally, he is one whose occupation it is to formulate or devise plans and designs and draw up specifications for buildings or structures, *and to superintend their construction*. But his preparation of preliminary sketches does not constitute architectural work. Though he may also be a builder, he more frequently restricts his activity to making the necessary plans and specifications, *and supervising the construction by the builder. He may also supervise the bids from contractors and subcontractors*. Supervision of the building alone, without having drawn the plans and made the designs is not, however, the practice of architecture; and one may so supervise without being required to have an architect's license.'' (5 Cal.Jur.2d, Architects, § 2, p. 124.) (Italics added.)

''An architect has been defined as one skilled in practical architecture; one whose profession it is to devise the plans and ornamentation of buildings or other structures *and direct their construction*. An architect or engineer has also been defined as one whose special business it is to design buildings, fix the thickness of their walls, the supports necessary for the maintenance of them in their proper position, and do all other necessary things in the line of his profession for the guidance of builders in the erection of buildings. *Architecture is the art of building according to certain determined rules*.'' (6 C.J.S., Architects, § 1, pages 295-296; italics added; see also 5 Am.Jur.2d, Architects, § 1, page 662.)

 All California decisions which dealt with the question in any particular are in complete accord. They make it clear that, although an architect is not under a *duty* to supervise construction (*Payne* v. *DeVaughn*, 77 Cal.App. 399, 402

[246 P. 1069]), they do so supervise as a matter of common practice (*Peak* v. *Richmond Elementary Sch. Dist.*, 161 Cal. App.2d 366, 368 [326 P.2d 860]), and such supervision is properly within the scope of their professional capacities. (*McDowell* v. *City of Long Beach*, 12 Cal.App.2d 634, 637-638 [55 P.2d 934]; *Payne* v. *DeVaughn, supra*, p. 402; *Peak* v. *Richmond Elementary Sch. Dist., supra*, p. 368.)

When architects do undertake supervision of construction in addition to the preparation of plans, they generally are compensated separately or additionally, and if they perform their supervisory duties in a negligent fashion, their liability therefor is separate and distinct from the liability of the party who negligently performs the actual building process. (*Alexander* v. *Hammarberg*, 103 Cal.App.2d 872, 879-880, 882-883 [230 P.2d 399].)

From the agreement in issue in the instant action, it is clear that respondent actually was contracting to perform as appellant's agent and in a supervisory capacity. He did not contract to build a building for a specified total cost. The contracts to be made with the actual builders, contractors and subcontractors were subject to the owner's prior written approval, and all payments were to be made directly by the owner. Such duties manifestly were within the scope of an architects "professional capacity."

In view of our determination on this issue, it becomes unnecessary for us to pass upon the question whether or not respondent also fell within the "employee exemption" (§ 7053), or whether the agreement was of such a variety that it might have been performed by one who was neither an architect nor technically an employee in the usual sense of the term.

In *Dorsk* v. *Spivack*, 107 Cal.App.2d 206 [236 P.2d 840], a party who was neither an architect nor a general contractor agreed to supervise the construction of a building for a flat fee payable upon completion. In that case the court, in addition to holding that the determination of the capacity in which the party contracted was one of fact, stated at page 209: "So far as statutory law is concerned, there is no provision of the Business and Professions Code which requires a mere supervisor or superintendent of building construction to be licensed."

The judgment is affirmed.

Fox, P. J., and Smith, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.

A petition for a rehearing was denied September 5, 1963, and appellant's petition for a hearing by the Supreme Court was denied October 1, 1963.